Filed 1/13/26  Daniels v. State Farm General Ins. Co. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| JACK DANIELS et al., | |
| Plaintiffs and Appellants, | A168938 |
| v. | |
| STATE FARM GENERAL INSURANCE COMPANY et al., | (Napa County Super. Ct. No. 18CV001467) |
| Defendants and Appellants. | |

In 2017, shortly after completing significant renovations, plaintiffs Jack and Gayle Daniels's home was destroyed in the Atlas Fire.  Their home was insured under a policy issued by State Farm General Insurance Company (State Farm).  State Farm paid the Danielses the policy limits of approximately $3.4 million.  On October 25, 2018, the Danielses sued State Farm and its agent for professional negligence and negligent misrepresentation, alleging that they had failed to increase the policy limits as requested.  A jury found both the insurance agent and the Danielses partially at fault for the failure to increase the policy limits before the fire.  It found total damages of $4,349,800.  Following posttrial briefing, the trial court entered judgment denying an offset for State Farm's prior payments under the policy and applying the comparative fault percentage allocated to

1

the Danielses, resulting in a judgment in favor of the Danielses for $2,218,398.

On appeal, the Danielses contend the trial court erred in giving the comparative fault jury instruction and that substantial evidence does not support the jury's finding of comparative fault. State Farm and its agent's cross-appeal asserts that the trial court erred in applying the collateral source rule to bar the offset based on State Farm's prior payment.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Trial Evidence*

We summarize the facts relevant to the issues presented and in the light most favorable to the jury's verdict. (*Sacramento Sikh Society Bradshaw Temple v. Tatla* (2013) 219 Cal.App.4th 1224, 1227.)

In July 2016, the Danielses purchased a home in Napa. Jack Daniels contacted Alyssa Samrick, who was an agent at State Farm's St. Helena insurance agency, about obtaining insurance for the Napa home. Daniels was a longtime customer of the agency, since the 1970's when it was run by Norman Manzer. Manzer retired in 2008 and Samrick took over the agency. When the Danielses purchased the Napa home in July 2016, they were living in a condominium that was insured by State Farm, through Samrick. Jack Daniels told Samrick's office that he intended to remodel the Napa home but wanted insurance for the house " 'as it existed' " in the meantime. Samrick prepared quotes for Jack Daniels and reviewed them with him by telephone. State Farm issued a homeowners policy for the period from July 25, 2016, to

---

[1] State Farm and its agent are represented by the same counsel. We refer to State Farm and its agent collectively as defendants. We refer to the defendants individually as necessary in explaining the factual background.

2

July 25, 2017, with limits of $1,440,990 for the dwelling; $144,090 for dwelling extensions; and $1,080,675 for personal property. Jack Daniels did not request an increase in the personal property limits. Further, he did not tell Samrick about his wine collection or advise her that he had purchased new items for the Napa home.

In February 2017, Jack Daniels called Samrick's office and informed them that they were selling the condominium and would be moving into the Napa home. He also said that " 'the renovation was ongoing and [they] wanted to make sure that the insurance stayed the same until the renovation was over.' " He said they generally intended to spend about $1 million on the remodel, but he was not able to provide " 'a number at that point in time for what [their] limits should be increased to.' "

The Danielses moved into the Napa home in late March 2017. Samrick spoke with Jack Daniels several times during the remodel process. She asked him for documentation of the specific work being done on the home or to schedule a visit to the property for an inspection. Daniels declined her request for an inspection until the project was completed.

In July 2017, the policy was renewed with slightly higher limits of $1,485,600 for the dwelling; $148,560 for dwelling extensions; and $1,114,200 for personal property. The Danielses did not contact Samrick to change or question the limits. Jack Daniels never made an explicit request to raise the policy limits by a specific amount, but he testified he asked for a maximum increase of $1 million and then $2 million.

On September 28 or 29, 2017, Jack Daniels contacted Samrick by telephone and told her that they had moved everything into the Napa home and had spent $2 million on the remodel, rather than the $1 million they initially anticipated. Samrick asked to come visit the property, but they did

not set a date because Mr. Daniels asked to wait until he finished the installation of high-end audiovisual equipment at the home. Samrick did not advise the underwriting department of the Danielses' remodel project because she did not believe she had sufficient information to submit a policy change request.

On October 8, 2017, the Napa home and its contents were destroyed in the Atlas Fire. The Danielses submitted a claim under their homeowners policy. State Farm paid the policy limits totaling $3,437,181.48, consisting of $2,295,697.48 for the dwelling (inclusive of all benefits available for trees and landscaping) and $1,141,484 for personal property.[2] State Farm also paid $127,191.59 for personal property covered under a personal articles policy.

The Danielses' general contractor witness testified that the cost to rebuild the Napa home was $5,120,177. Their personal property appraisal witness testified that the actual cash value was $7,779,524.28. The replacement cost value of the Danielses' personal property loss was approximately $11 million (inclusive of $8,555,187.53 for the Danielses' wine collection. A consulting arborist testified that the appraisal value for replacement of the trees and shrubs was $220,582.

---

[2] The parties stipulated to the policy limit amounts paid under the State Farm policy for the loss the Danielses suffered due to the Atlas Fire. We note the trial also included evidence that the policy limits of the homeowners policy as of July 2017 were $1,485,600 for the dwelling; $148,560 for dwelling extensions; and $1,114,200 for personal property. The parties do not explain the discrepancy between the policy dwelling limits ($1,485,600) and the higher amount they stipulated State Farm paid for the dwelling limits ($2,295,697.48). Nor is the discrepancy relevant to our consideration of the issues on appeal.

## II. *Verdict*

The trial court granted State Farm's motion for directed verdict on the professional negligence cause of action. It denied State Farm's motion for directed verdict as to the negligent misrepresentation cause of action and as to emotional distress damages.

The jury issued a special verdict finding that Samrick was professionally negligent and that her negligence was a substantial factor in causing harm to the Danielses. It found that Samrick was acting within the scope of her agency with State Farm when she harmed the Danielses. The jury awarded economic damages of $2,485,600 "related to the Home" and $1,864,200 "related to Personal Property." It did not award any damages "related to Trees and Landscaping." Nor did it award emotional distress damages. The jury also found the Danielses negligent in doing what was reasonable to obtain the homeowners insurance coverage limits they wanted. It assigned 51 percent of fault to Samrick and 49 percent to the Danielses. The jury found neither Samrick nor State Farm liable for negligent misrepresentation.

## III. *Posttrial Issues and Judgment*

Following the verdict, the parties submitted posttrial briefs regarding comparative fault, prejudgment interest, and an offset for State Farm's prior payment. On March 3, 2023, the trial court heard arguments and stated its tentative rulings to reduce the damages award based on the comparative fault finding and to deny prejudgment interest. It ordered further briefing as to whether the collateral source rule applied to preclude an offset of damages based on State Farm's prior payment. Following the parties' supplemental briefing, the trial court held another hearing, at which it denied defendants' request for an offset based on State Farm's prior payment. It explained that

5

the jury instructions on damages supported the court's view that "the damages that the jury found specifically were related to the professional negligence of . . . Samrick and not from the fire" and that State Farm's prior payment was made for the harm caused by the fire and was paid under its policy for which the Danielses paid premiums.

Judgment was entered in favor of the Danielses for $2,218,398, which represented the total damages determined by the jury, reduced by 49 percent based on the comparative fault finding.

## DISCUSSION

### I.     *Comparative Fault Instruction*

Over the Danielses' objection, the trial court instructed the jury: "Alyssa Samrick claims that Jack and Gayle Daniels' own negligence contributed to their harm.  To succeed on this claim, Alyssa Samrick must prove both of the following: [¶] 1. That Jack and Gayle Daniels were negligent; and [¶] 2. That Jack and Gayle Daniels' negligence was a substantial factor in causing their harm. [¶] If Alyssa Samrick proves the above, Jack and Gayle Daniels' damages are reduced by your determination of the percentage of Jack and Gayle Daniels' responsibility.  I will calculate the actual reduction."  (CACI No. 405 [Comparative Fault of Plaintiff].)

The Danielses argue that the trial court erred in giving the comparative fault instruction.  They claim that comparative fault is inapplicable to professional negligence claims.  They also assert substantial evidence did not support the giving of the comparative fault instruction or the jury's comparative fault finding.  " 'A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence.' [Citation.]  'The

6

propriety of jury instructions is a question of law that we review de novo.' [Citations.]" (*Yale v. Bowne* (2017) 9 Cal.App.5th 649, 656–657 (*Yale*).)

## A. The comparative fault doctrine applies to professional negligence cases.

The Danielses contend that they, as laypersons, cannot be comparatively negligent in a professional negligence case involving a professional agent's failure to perform specific duties that only the professional agent could perform. They assert that they cannot be at fault for being underinsured after they requested that Samrick increase their coverage.[3] They primarily rely on three California cases in support of their position (*Williams v. Hilb, Rogal & Hobbs Ins. Services of California, Inc.* (2009) 177 Cal.App.4th 624 (*Williams*); *Theobald v. Byers* (1961) 193 Cal.App.2d 147 (*Theobald*); *Daley v. County of Butte* (1964) 227 Cal.App.2d 380 (*Daley*)) and one New Jersey Supreme Court case (*Aden v. Fortsh* (2001) 169 N.J. 64 [776 A.2d 792]). We are unpersuaded by the Danielses' authority.

*Williams* involved the liability of an insurance agency for negligence in advising on, procuring, and maintaining an insurance package for a business that did not include workers' compensation insurance. (*Williams, supra*, 193 Cal.App.2d at p. 627.) The business owners sued the insurance agency after one of their employees obtained a multimillion-dollar judgment against them for a workplace injury. (*Ibid.*) Following a bench trial, the court entered judgment in favor of the owners. (*Ibid.*) One of the issues on appeal was whether the trial court erred in refusing to find the business owners comparatively negligent because they failed to read their insurance policies. (*Ibid.*) The trial court credited the business owners' testimony that the

---

[3] We note that Samrick testified the Danielses never made a specific request for an increase in policy limits.

7

insurance agent never advised the owners that they were required to obtain separate workers' compensation insurance over the agent's testimony that she offered and discussed workers' compensation with the owners and they declined the coverage. (*Id.* at p. 634.) The trial court also concluded that "its analysis of the evidence 'does not lead us to assign a reasonably recognizable level of comparative liability to [the owners].' " (*Id.* at p. 635.) The Court of Appeal rejected the argument that an insured's failure to read a policy is negligence as a matter of law. (*Id.* at p. 643.) After noting that an appellate court may not reweigh evidence, consider witness credibility, or resolve conflicts in the evidence, it upheld the trial court's factual findings that the evidence did not support comparative fault. (*Id.* at pp. 643–644.) *Williams* does not stand for the position that comparative fault is never applicable in cases of professional negligence. Moreover, as discussed further *post*, there was evidence here not only of the Danielses' failure to question their policy limits when they received the policy but also of their failure to provide Samrick with the details of their remodel project and their personal property, and their declinations of Samrick's requests to inspect the property.

Nor does *Theobald* support the Danielses' position. *Theobald* was decided before the California Supreme Court adopted the comparative fault doctrine in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804. (*Theobald, supra*, 193 Cal.App.2d at p. 147.) Thus, the issue was whether contributory negligence, which if found would be a complete bar to recovery, applied to nonprofessionals. (*Theobald, supra*, 193 Cal.App.2d at p.151.) The trial court found the plaintiffs/clients contributorily negligent in a legal malpractice case. (*Id.* at p. 151.) Although the Court of Appeal reversed the judgment on the basis that the contributory negligence finding was not supported by substantial evidence, it rejected the plaintiffs' claim that

8

contributory negligence may never apply in legal malpractice actions. (*Id.* at pp. 149–150, 151, 153.) "[A]ny other rule would be grossly unfair." (*Id.* at p. 150.)

*Daley*, also decided before *Li v. Yellow Cab Co.*, did not directly involve the contributory negligence doctrine. Instead, it addressed whether a plaintiff was entitled to relief from a dismissal for failure to prosecute entered after her attorney delayed serving a necessary party; failed to appear at pretrial conferences; failed to communicate with his client, opposing counsel, and the court; and delayed filing a substitution of counsel after agreeing to withdraw. (*Daley, supra*, 227 Cal.App.2d at pp. 386–388, 391–392.) The trial court denied the plaintiff's motion for relief based on excusable neglect under Code of Civil Procedure section 473. (*Daley*, at p. 387.) The Court of Appeal found the attorney's neglect was extreme and amounted to "positive misconduct," such that the plaintiff was "effectually and unknowingly deprived of representation." (*Id.* at p. 391.) It rejected the argument that the plaintiff ignored her attorney's lapses because the evidence showed she was unaware of them. (*Id.* at p. 392.) Under those circumstances, the *Daley* court found that the attorney's neglect should not be imputed to the client. (*Ibid.*) *Daley* does not even involve the issue of contributory negligence, much less suggest that it does not apply against professionals.

Nor are we persuaded to follow the New Jersey Supreme Court's decision in *Aden v. Fortsch, supra*, 169 N.J. 64. In *Aden*, an insurance broker obtained a condominium policy for the plaintiff/insured with minimal policy limits for the dwelling. There was conflicting testimony as to whether the broker told the insured to verify whether the homeowners association's insurance policy provided coverage for losses not covered under the

9

condominium policy. (*Id.* at pp. 70–71.) The insured accepted the condominium policy but did not read it when he received it. (*Id.* at p. 70.) After a fire, the insured learned that he had insufficient coverage to repair the interior damage to his condominium. (*Id.* at p. 72.) The issue on appeal was whether the trial court should have instructed the jury on comparative negligence for the insured's failure to read the condominium policy. (*Id.* at p. 69.) In a 4–3 decision (*id.* at p. 94), the New Jersey Supreme Court concluded that the insured's failure to read the policy could not be asserted as comparative negligence and explained that "professionals may not diminish their liability under the Comparative Negligence Act when the alleged negligence of the client relates to the task for which the professional was hired." (*Id.* at pp. 78, 81–82.) However, *Aden* also explained that comparative negligence may apply "if a client impedes the professional in his or her performance by . . . withholding or failing to provide certain information to the professional" (*id.* at p. 77) and stated that "had [the insured] told [the broker] that his personal contents were worth less than they actually were, or had he provided wrong or inadequate information to [the broker], a comparative negligence charge would have been appropriate to allow the jury to apportion fault" (*id.* at p. 83). Unlike here, in *Aden* the alleged comparative fault was based solely on the insured's failure to read his policy. (*Id.* at p. 69.) As we explain *post*, there is evidence that not only did the Danielses not question the policy limits when they received the policy but also they delayed Samrick's request for a home inspection and did not provide details of the remodeling project or the home's contents, including their wine collection. Thus, *Aden* is distinguishable.

As State Farm notes, California law has long applied the comparative fault doctrine in professional negligence cases. (E.g., *Brandon G. v. Gray*

10

(2003) 111 Cal.App.4th 29, 41–42 [affirming comparative fault finding against client in legal malpractice action]; *Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1197 [comparative fault finding in medical malpractice case]; *New Hampshire Ins. Co. v. Sauer* (1978) 83 Cal.App.3d 454, 460–462 [affirming comparative fault allocation in insurance company's negligence action against insurance agent for breach of duty to inform company of nature of insured's business].)

More recently, in *Yale, supra*, 9 Cal.App.5th 649, the Court of Appeal rejected the plaintiff's argument that it was error to give a comparative fault instruction in a legal malpractice case. (*Id.* at pp. 660–661.) In *Yale*, the plaintiff sued the attorney she hired to prepare a trust document for her and her then-husband that would maintain her assets as separate property rather than as community property. (*Id.* at p. 651.) The attorney instead prepared trust documents and deed transfers listing the property as community property. (*Id.* at p. 656.) The plaintiff saw that the deeds stated " 'community property' " and understood what that meant, but she did not raise any questions about it and signed the deeds. (*Ibid.*) The jury found her 10 percent at fault. (*Id.* at p. 654.) The Court of Appeal rejected the plaintiff's claim—similar to the Danielses' claim here—that "the principle of comparative fault 'defies reason' because of 'the great disparity in knowledge and experience between lawyers and [their] clients,' and in particular in this case." (*Id.* at p. 658.) It found that the evidence, which included that the plaintiff read the documents, saw the incorrect reference to community property, understood what it meant, and remained silent rather than question her attorney, was sufficient for the jury to evaluate whether her failure to raise the issue before signing the documents contributed to her damages. (*Ibid.*) Having concluded that under California law the

11

comparative fault doctrine may apply in professional liability actions, we now turn to whether substantial evidence supported the instruction in this case.[4]

## B. Substantial evidence supported the comparative fault instruction and the jury's finding.

The Danielses contend that substantial evidence did not support the giving of the comparative fault instruction or the jury's finding. However, their recitation of the evidence overwhelmingly focuses on the testimony favorable to them rather than analyzing all of the evidence on the issue of the Danielses' actions. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 [party challenging sufficiency of the evidence to support findings must set forth and analyze all evidence on that point, both favorable and unfavorable].) The record includes Samrick's testimony that after the Danielses received the policy they did not request a change in the policy limits, as well as Mr. Daniels's testimony from his deposition stating that he had no recollection of contacting Samrick's office with any questions or concerns about the renewal policy.[5] Samrick also testified that although she knew the Danielses were remodeling their home, she did not know the specifics about what was being done. When Mr. Daniels told Samrick that the total cost of the remodel had increased to $2 million, he still

---

[4] United Policyholders filed an amicus curiae brief arguing that the comparative fault doctrine should not apply in insurance agent negligence cases. As explained *ante*, we are unpersuaded that comparative fault should not apply to professional negligence actions as a matter of law.

[5] At trial, Mr. Daniels testified that he contacted Samrick's office shortly after receiving the policy renewal documents and stated that the renovations were nearly completed and that they had spent more than $1 million. He testified that the agency assured him that he had insurance. The fact of the telephone call was supported by phone records. However, his testimony about the substance of the call was impeached with his deposition testimony.

did not provide her with a breakdown between the costs of construction and the amounts spent on personal property contents. Samrick explained that she needed these details in order to allocate the coverage limits between dwelling coverage and personal property coverage. Mr. Daniels even testified that he did not specifically inform Samrick of the art and furniture that was purchased for the Napa home. He testified that he moved his wine collection to the Napa home in May 2017. He said he believed he told Samrick that his wine collection was worth about $3.5 million, but he was impeached with his deposition testimony acknowledging that between May 2017 and September 2017 he did not tell anyone that he had $3.5–5 million worth of wine at his property. Samrick also testified that during her conversations with Mr. Daniels she was clear that she needed more detailed information from him before she could increase the policy limits. Mr. Daniels declined Samrick's request for an inspection of the property until the project was completed. He testified at his deposition that when he spoke with Samrick's office regarding the renovation, he said he " 'wanted to make sure the insurance stayed the same until the renovation was over.' " An assistant at Samrick's office confirmed that before the fire she contacted Mr. Daniels to check on the status of the remodel and to schedule an inspection. He confirmed that he wanted to wait until the project was completed. Samrick testified that during her conversation with Mr. Daniels on September 29, 2017, she reiterated that she needed to schedule an inspection before increasing the coverage and he again told her that he wanted to wait until after the audiovisual system was installed.

The Danielses highlight testimony that supports their version of events and dismiss Samrick's testimony regarding her requests for information as "self-serving." However, it is for the jury to make these factual

13

determinations, and we have no power to reweigh the evidence, consider witness credibility, or resolve conflicts in the evidence. (*Williams, supra*, 177 Cal.App.4th at pp. 643–644.) On this record, we find substantial evidence sufficient for the trial court to give the comparative fault instruction, as well as substantial evidence supporting the jury's comparative fault finding. (*Yale, supra*, 9 Cal.App.5th at pp. 656–657.)

## II. *Defendants' Cross-appeal Regarding Trial Court' Denial of Offset*

State Farm and Samrick's cross-appeal asserts that the trial court erred by applying the collateral source doctrine to preclude an offset based on State Farm's prior payment of $3.5 million. Before providing the additional facts regarding the posttrial briefing and the trial court's decision, we begin with a summary of the collateral source doctrine.

### A. Collateral Source Doctrine

The collateral source rule provides that when "an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) *Helfend* explains that the rule "expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide

14

himself with insurance." (*Id.* at p. 10.) Stated another way, "[t]he collateral source rule . . . embodies the venerable concept that a person who has invested years of insurance premiums . . . should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence." (*Id.* at pp. 9–10, fn. omitted.)

The collateral source rule " 'operates both as a substantive rule of damages and as a rule of evidence.' " (*Rotolo Chevrolet v. Superior Court* (2003) 105 Cal.App.4th 242, 245.)

### B. Additional Facts

#### 1. Relevant Jury Instructions

We summarize the relevant jury instructions on damages to provide context for the defendants' offset argument.

The jury was instructed with CACI No. 3900 (Introduction to Tort Damages—Liability Contested), stating: "If you decide that Jack and Gayle Daniels have proved their claims against Alyssa Samrick and/or State Farm, you also must decide how much money will reasonably compensate Jack and Gayle Daniels for the harm. This compensation is called 'damages.' [¶] The amount of damages must include an award for each item of harm that was caused by Alyssa Samrick and/or State Farm's wrongful conduct, even if the particular harm could not have been anticipated. [¶] Jack and Gayle Daniels do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages. [¶] The following are the specific items of damages claimed by Jack and Gayle Daniels: Economic Damages and Noneconomic Damages." It was further instructed, "The damages claimed . . . for the harm caused by Alyssa Samrick and/or State Farm fall into two categories called economic damages and noneconomic damages," and the

15

specific items of economic damages are: "Damages related to the Home; [¶] Damages related to the Personal Property; [¶ and] Damages related to the Trees and Landscaping."[6]

CACI Nos. 3933 (Damages from Multiple Defendants) and 3934 (Damages on Multiple Legal Theories) instructed that the Danielses sought damages from Samrick on negligence grounds and from Samrick and State Farm on negligent misrepresentation grounds, and that the jury must determine the liability of each defendant separately. The jury was instructed on the "Issue of Damages Duplication" that "(1) If you award damages, your award should be in the amount you determine is proper for each cause of action. Do not concern yourself with the issue of duplication. Do not discount damages on any cause of action because there are multiple causes of action. I will calculate any necessary reduction to avoid duplication. [¶] (2) Also, you are not to consider amounts previously paid by State Farm General Insurance Company to Plaintiffs. I will deduct prior amounts paid to Plaintiffs after your verdict is reached."

### 2. Special Verdict

The jury found that Samrick, acting within the scope of her agency with State Farm, was professionally negligent and that her negligence was a substantial factor in causing the Danielses harm. It found against the Danielses on the negligent misrepresentation causes of action against State Farm and Samrick.

Question 4 on the verdict form, regarding Samrick's professional negligence asked, "What are Jack and Gayle Daniels' total damages? [¶] (a) If

---

[6] The jury was also instructed on noneconomic damages and emotional distress. The jury awarded no damages in this category, and that finding is not an issue on appeal.

16

you award damages, your award should be in the amount you determine is proper for each cause of action. Do not concern yourself with the issue of duplication. Do not discount damages on any cause of action because there are multiple causes of action. The Court will calculate any necessary reduction to avoid duplication. [¶] (b) Also, you are not to consider amounts previously paid by State Farm General Insurance Company to Plaintiffs. The Court will deduct prior amounts paid to Plaintiffs after your verdict is reached." It then asked for itemized economic damages for (i) "Damages related to the Home," (ii) "Damages related to Personal Property," and (iii) "Damages related to Trees and Landscaping." The jury awarded $2,485,600 for "Damages related to the Home" and $1,864,200 for "Damages related to Personal Property." It awarded no damages for trees and landscaping and no damages for emotional distress.

### 3. Postverdict Arguments Regarding Offset

After the verdict, the parties filed simultaneous posttrial briefs. The Danielses' posttrial brief asserted, among other arguments,[7] that the jury's damages award should not be reduced by State Farm's prior insurance payment. They argued the collateral source rule precludes reducing the damage award by State Farm's prior payment under the homeowners policy. They claimed, in part, that public policy considerations do not support a tortfeasor such as Samrick benefitting from the payments made by State Farm under a policy for which the Danielses paid premiums.

---

[7] The Danielses also argued prejudgment interest should be calculated and the judgment should not be reduced by comparative fault. The trial court denied prejudgment interest, which is not an issue on appeal. As discussed *ante*, the judgment reduced the verdict based on the jury's comparative fault finding, which we affirm.

The defendants' posttrial brief argued an offset was necessary because State Farm already paid a portion of the "exact losses" awarded by the jury. The defendants claimed that the jury was instructed not to consider the prior payment and that the court would deduct those amounts after the verdict. They asked the trial court first to reduce the damages award based on the comparative fault finding to $2,218,398 and then to deduct the approximately $3.4 million payment made by State Farm under the policy. The result of their proposed calculations is that the defendants would owe nothing. The defendants contended that the collateral source doctrine does not apply because "the payments under the policy were not made to remedy Ms. Samrick's negligence" and that State Farm is not a wholly independent third party.

The Danielses' response brief claimed it would be unjust to reduce the verdict against Samrick by the approximately $3.44 million of policy benefits previously paid by State Farm. They argued that the jury instruction on duplication of damages was not an admission that a verdict reduction was required but, rather, that the court would consider any necessary postverdict reductions to avoid duplication. They noted that the instruction on duplication of damages was drafted before the trial court (through the directed verdict) and the jury determined that State Farm was not liable directly.

The parties argued the issue before the court on March 3, 2023. The Danielses' counsel responded to the trial court's question regarding damages by explaining that the verdict's damages award was the amount necessary to compensate the Danielses for the harm suffered due to Samrick's negligence. This amount was intertwined with the damage caused by the fire. Defendants' counsel argued the damages that were presented to the jury

18

were the fire damage to the home and the fire damage to the property. The trial court stated that if the damages to the home and property were amounts caused by the underinsurance due to Samrick's actions, then State Farm's prior payment should not be deducted "because [State Farm] didn't make any payments related to that damage or harm." It considered the verdict form, which found Samrick's negligence caused harm to the Danielses, and jury instructions telling the jury that damages must include " 'an award for each item of harm that was caused by Alyssa Samrick and/or State Farm's wrongful conduct.' " It noted that there were no instructions telling the jury to consider the economic damages from the fire.

The trial court's tentative view was that the jury award "flow[s] directly from the harm of being underinsured and that the comparative negligence analysis also goes to the harm and negligence or the harm of under-insurance, not the fire itself." Defendants acknowledged that the jury was not instructed to determine losses from the fire, but they argued that was the way the damages were presented at trial. The court was unpersuaded, stating it viewed "the 4,349,800 as how much damage was caused by Alyssa Samrick, not the fire. [¶] The way I see it at this point is that State Farm made no contributions or payments to that harm. They paid for the fire, the damages to the fire, but made no payments for being underinsured for Alyssa Samrick's negligence." (*Sic.*) Its tentative ruling on the issues raised in the parties' posttrial briefing was to deny prejudgment interest, reduce the award based on the Danielses' comparative fault, and deny a reduction based on State Farm's prior payment, resulting in a judgment in favor of the Danielses of $2,218,398. However, the trial court invited another full round of briefing on the issue of whether the verdict should be reduced by State Farm's prior payment.

19

State Farm's supplemental brief reiterated its arguments that the collateral source doctrine did not apply because State Farm was not " 'wholly independent' " of Samrick and that the damages awarded were only for "fire-related economic loss."

Following the supplemental briefing, the trial court entered judgment in favor of the plaintiffs for $2,218,398. It explained its decision not to reduce the verdict further based on State Farm's prior payment as follows: "[W]ith regard to the collateral source rule and reducing the award, the Court will not be deducting the payments made by State Farm in that the Court sees that the damages that the jury found specifically were related to the professional negligence of Alyssa Samrick and not from the fire. The Court looked at various jury instructions individually, and really all the jury instructions together, with specific note of Jury Instruction 3902, Economic and Noneconomic Damages, which talked about what the actual damages were. Reading: 'The damages claimed by Jack and Gayle Daniels for the harm caused by Alyssa Samrick and/or State Farm fall into two categories called economic and noneconomic damages. You'll be asked on the verdict form to state the two categories of damages separately.' [¶] And I expected the jury did that, and that they found the damages that were caused by the professional negligence and not the fire. [¶] There were instructions that told the jury to not concern themselves with the issue of duplication of damages and not consider amounts previously paid by State Farm. And the damages from the professional negligence manifested themselves in physical damages and to the home and personal property . . . , and the jury didn't award damages for noneconomic. [¶] But the amounts that were paid by State Farm represented the contract that Jack and Gayle Daniels had with State Farm for a period of almost 20 years, where Jack and Gayle Daniels paid premiums

over that time.  And State Farm's payment was made for the harm caused by the fire.  State Farm and/or Alyssa Samrick had no previous payments made that relate directly to the professional negligence of Alyssa Samrick.  And the jury found that State Farm was not responsible for negligence. [¶] . . . [¶] The Daniels asked for roughly $11 million in damages, including a $7 million wine collection.  Damages to rebuild the home. . . .  Plaintiffs' witness . . . testified that the total amount to rebuild the home as of April 2022 would have been $5,120,177.  There were various other costs to rebuild and yet the jury came back with a $4,349,800 economic damages related to home and personal property. [¶] And that seems to be, when you look at all of the numbers together, really related to Alyssa Samrick's negligence and what she could have insured without inspecting the home.  When you look at the faults the jury assessed to the Daniels . . . , that brings Alyssa Samrick's responsibility to $2,218,398, which is somewhat close to what the testimony was that she would have been able to potentially insure without inspecting the home. . . . [¶] So the Court is reducing the $4,349,800 by the negligent determination of 49 percent on behalf of Jack and Gayle Daniels for a total judgment of $2,218,398 . . . in favor for the plaintiffs . . . ." (*Sic.*)

In response to State Farm's counsel's question asking for clarification that the court was finding that State Farm was a collateral source, the trial court stated: "I am—I couldn't find any case that was similar to this . . . this is a really fact-specific inquiry on what the jury decided, and that they're separate harms.  There was the harm caused by the fire and the harm caused by the professional negligence, and the jury just decided the professional negligence.  And so any payment that was made by State Farm was not—was for the damages caused by the fire, not caused by the professional negligence."

## C.  Analysis

### 1.  Standard of Review

Defendants acknowledge that a trial court's ruling on an equitable offset request is reviewed for abuse of discretion.  (*Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 103.)  However, they claim, without citation to any authority, that whether the collateral source rule should apply to a damages award is an issue of law.  They then state, in multiple places in their brief, that the trial court's decision in denying the offset was an abuse of discretion.  The issue before the trial court was the parties' competing claims as to whether the jury's damages award should be offset by State Farm's prior payment.  We apply the abuse of discretion standard.  (*Ibid.*)  Under this standard, reversal is not warranted merely because reasonable people might disagree, and we may not substitute our judgment for the judgment of the trial court.  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  To establish an abuse of discretion, State Farm must establish that the trial court's decision is so irrational or arbitrary that no reasonable person could agree with it.  (*Ibid.*)

### 2.  Trial Court Did Not Err in Applying Collateral Source Rule to Bar Offset

Defendants contend it was error for the trial court to apply the collateral source rule to bar an offset for State Farm's prior payment under the homeowners policy.  They assert the rule is inapplicable because State Farm is not wholly independent of its agent Samrick and contend that if they do not receive a credit for State Farm's prior claim payment, then State Farm will be "compelled to pay twice for the exact same property damage."  (Italics omitted.)

Neither party cites case authority directly on point, and the trial court noted it also did not find case law regarding the factual scenario present

here.  Nor have we found a case directly on point.  However, we agree with the Danielses that the reasoning of *Barnes v. Western Heritage Ins. Co.* (2013) 217 Cal.App.4th 249 (*Barnes*) is somewhat analogous.

In *Barnes*, the plaintiff was injured while participating in a recreational program sponsored by the Shingletown Activities Council (Activities Council).  (*Barnes, supra*, 217 Cal.App.4th at p. 251.)  He sued the Activities Council and other defendants for negligence and premises liability, seeking general damages and compensation for medical expenses.  (*Id.* at p. 254.)  Western Heritage Insurance Company (Western Heritage), the insurer for the Activities Council (*id.* at p. 252), defended the personal injury lawsuit, which was ultimately settled with a payment to the plaintiff.  (*Id.* at p. 255.)  The plaintiff later sued Western Heritage directly for breach of contract and bad faith, alleging Western Heritage failed to pay for all his medical expenses under a separate medical payment provision in the policy which provided coverage for medical expenses of a person injured on the insured's premises caused by an accident regardless of fault.  (*Id.* at pp. 257, 253, fn. 2.)  The trial court granted Western Heritage's motion for summary judgment, concluding that the personal injury action resolved the issue of payments due to the plaintiff for medical expenses under the policy and he could not seek to recover more than once for the same injury.  (*Id.* at p. 257.)

The Court of Appeal reversed, concluding that the case did not present an issue of an impermissible double recovery.  (*Barnes, supra*, 217 Cal.App.4th at p. 259.)  It reasoned that the insurer had separate and distinct obligations under the policy to defend and indemnify its insured (the Activities Council) and to make payments for medical expenses under the medical payment provision.  (*Ibid.*)  "By satisfying the settlement in the personal injury action, Western Heritage performed its obligations to the

23

Activities Council under the liability provision of the policy, an obligation that was separate and divisible from the duty under the medical payment provision." (*Id.* at p. 260.)  The Court of Appeal distinguished case law finding that a tortfeasor's insurance policy is not "wholly independent from, and collateral to, the tortfeasor" and concluded that the plaintiff "first brought a personal injury action against the Activities Council, alleging that the Activities Council was the wrongdoer.  The Activities Council maintained liability insurance for that purpose, and that funding source was not collateral to the Activities Council, the alleged wrongdoer.  But plaintiff now brings a separate lawsuit against the insurer, Western Heritage, alleging that Western Heritage is the wrongdoer.  The policy at issue was not maintained by Western Heritage to provide coverage for *its* wrongdoing, and hence the insurance policy is collateral to the alleged wrongdoer.  The collateral source rule does not bar [the plaintiff's] present action." (*Id.* at pp. 260–261.)

Similarly here, State Farm made a payment under the policy it issued to the Danielses.  The Danielses then sued State Farm and Samrick in the present action, not for payment under the policy but for professional negligence and negligent misrepresentation based on the failure to procure increased policy limits under the homeowners policy.  State Farm's prior payment under the homeowners policy was not a payment for State Farm's or Samrick's wrongdoing and, thus, is collateral as to their liability for professional negligence. (*Barnes, supra*, 217 Cal.App.4th at p. 261.)

Unlike here, the alleged collateral source in *Barnes* was a payment made on behalf of a tortfeasor under a third party liability policy. (*Barnes, supra*, 217 Cal.App.4th at pp. 259–260.)  Here, the alleged collateral source is State Farm's payment under a first party homeowners policy for damages

24

caused by a fire. However, in both cases the insurer that made the prior payment was sued for additional liability: in *Barnes*, for coverage under a separate portion of the policy (*Barnes, supra*, 217 Cal.App.4th at pp. 259–260); and here, based on the insurer's agent's negligence in failing to increase the policy limits.

This case does not present the more typical collateral source fact pattern in which medical or other injury compensation received by the plaintiff from sources independent of the defendant (such as the plaintiff's health, disability, or accident insurance or benefits) are not deducted from the damages caused by the defendant. (*Smock v. State of California* (2006) 138 Cal.App.4th 883, 886–887.) However, as noted by our Supreme Court in *Helfend*, "[t]here are many sorts of collateral sources and a great variety of contexts in which the 'rule' might be applied." (*Helfend, supra*, 2 Cal.3d at p. 6, fn. 3; see *Roto Chevrolet v. Superior Court, supra*, 105 Cal.App.4th at p. 249, fn. 8 ["the rule bends to the needs of equity and fairness"].)

We find no abuse of discretion in the trial court's application of the collateral source rule to preclude an offset of damages. The trial court carefully considered the parties' positions and determined that defendants were not entitled to an offset for State Farm's prior payment because the prior payment was not for damages caused by its agent's negligence. Under these circumstances, State Farm's prior payment under the homeowners policy may be considered wholly independent of Samrick and the damages caused by her negligence, for which State Farm is vicariously liable. (*Barnes, supra*, 217 Cal.App.4th at p. 261.)

Under a separate subheading, the defendants argue that the jury award represented the amount of policy benefits that the Danielses should have received and, therefore, the trial court "abused its discretion by

25

concluding that the award represented something other than the Daniels' [*sic*] wildfire-related property loss, for which they had already been partially compensated." Quoting from the Danielses' complaint, they assert that the Danielses presented their economic damages as their " 'out-of-pocket expenses necessary to rebuild their property, and necessary to replace their personal property.' " They then cite to CACI No. 3903, which instructed the jury, "The follow [*sic*] are the specific items of economic damages claims by Jack and Gayle Daniels: [¶] Damages related to the Home; [¶] Damages related to the Personal Property; [¶] Damages related to the Trees and Landscaping," and instructed as to the verdict form's breakdown of economic losses relating to the same three categories. They also cite to the Danielses' argument to the jury that, based on their expert witnesses' valuations of the cost to rebuild their home, the value of the personal property, and the value of the trees and landscaping, their total damages were $13.1 million. According to defendants, based on the Danielses' presentation of their damages, the jury instructions, and the verdict form, "the only reasonable conclusion from the trial evidence is: the award represented the total amount of policy benefits for Atlas Fire damage that [the Danielses] would have received if Agent Samrick had completed the coverage increase process." Thus, they claim, the trial court abused its discretion by concluding that the jury award did not include damages for which the Danielses already received payment.

Defendants cite no authority for their argument, and they only reference select jury instructions. They focus on CACI No. 3903 (Items of Economic Damages) in isolation. However, as the trial court found, the jury instructions, when read together, asked the jury to determine the amount of damages caused by Samrick's professional negligence. CACI No. 3900

26

instructed the jury to decide "how much money will reasonably compensate [the Danielses] for the harm. This compensation is called 'damages.' [¶] The amount of damages must include an award for each item of harm that was *caused by* Alyssa Samrick and/or State Farm's wrongful conduct . . . ." (Italics added.) CACI No. 3902 explains that "[t]he damages claimed by [the Danielses] for the *harm caused by* Alyssa Samrick and/or State Farm fall into two categories called economic damages and noneconomic damages." (Italics added.) The jury was also instructed that "[t]he arguments of the attorneys are not evidence of damages. Your award must be based on your reasoned judgment applied to the testimony of the witnesses and the other evidence that has been admitted during trial." (CACI No. 3925.) When considered together, we agree with the trial court's determination that the jury was asked to determine the amount of damages caused by Samrick's negligence and not the amount of damages caused by the Atlas Fire.

### 3. Impact of Alleged Agreement to Allow Offset

Under another separate subheading, stating, "The Daniels' [*sic*] Belated Collateral Source Argument is Directly Contrary to their Representations to the Court and to the Parties," the defendants assert that the Danielses' posttrial position opposing an offset for State Farm's prior payment was contrary to their prior agreements to allow an offset, their representations to the jury, the jury instructions, and the verdict form. (Italics omitted.) They refer to a statement in the Danielses' pretrial brief stating that after the jury awards economic damages, "post-verdict, . . . 'the Court shall subtract [from the jury award] the amounts previously paid by Defendant State Farm and received by Plaintiffs for the loss of their home and personal property,' " as well as to the jury instruction and statement on the verdict form that the jury was not to consider amounts previously paid by

27

State Farm and that the court would deduct the prior payments after the verdict was reached.  They further contend that the Danielses' counsel's closing argument specifically referenced the instruction regarding State Farm's prior payment, stating that "the Judge instructed you that he will deduct amounts previously paid.  The Daniels will not be getting paid twice for amounts that they were previously paid.  And the Judge's instruction to you was that you are not to consider those amounts previously paid if you award damages because he will take care of that.  He knows the stipulation of the parties in terms of the actual amounts paid.  So if an award is rendered, the Court will make sure that the ultimate amount deducted makes certain that the Daniels do not get paid twice. . . ."  (*Sic.*, boldface and italics omitted.)

Defendants contend the Danielses misrepresented how their economic damages award would be treated by the parties and the court, and they conclude that allowing the trial court's application of the collateral source rule on this record is unfair and must be reversed.  They cite no authority in support of their argument that reversal is required based on the Danielses' alleged misrepresentation.  (See *City of San Jose v. Sharma* (2016) 5 Cal.App.5th 123, 147–148 [rejecting argument because party cited no authority to support it:  "This court is not obligated to act as counsel for [party] and search for authority to support its legal conclusions"].)

The Danielses' response brief asserts that the prosecution of the case changed after the jury and the trial court determined that State Farm was not itself directly liable.  The Danielses argue that the trial court correctly determined, postverdict, that no offset was necessary because the jury awarded damages for Samrick's negligence and not for the fire, and that they were not paid twice for damage caused by the fire.  They claim, "Had State

Farm remained itself a direct defendant, the analysis and calculus may have been different," but that on this record there is no basis to reverse the trial court's decision to deny an offset. The defendants' reply brief does not respond to these points. (*Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681 [failure of appellant to address respondent's argument in reply brief " 'implicitly conced[es] . . . [respondent's] argument on this point' "].)

Given that the defendants have not presented a separate legal theory supported by authority explaining why we should reverse the trial court's offset ruling based on the Danielses' alleged misrepresentations, we understand their argument to be that the Danielses' statement in their pretrial brief, the verdict form, the jury instructions regarding damage duplication, and the Danielses' arguments to the jury further support their position that the collateral source rule should not apply to preclude an offset for its prior payment. We note the defendants did not bring to the trial court's attention that the Danielses' pretrial brief stated any economic damages should be reduced based on State Farm's prior payment. As discussed *ante*, based on a review of the instructions read together, we find no abuse of discretion in the trial court's decision to deny an offset. The trial court considered defendants' arguments regarding the jury instructions and the Danielses' statements to the jury and ultimately found that the jury's award was for harm caused by Samrick's "professional negligence and not the fire" and that the amounts previously paid by State Farm were only for the harm caused by the fire and not for Samrick's professional negligence. Therefore, the trial court declined to allow an offset. The jury instructions on duplication of damages and the instruction not to consider prior payments advised the jury that the trial court would "calculate any necessary reduction to avoid duplication" and that the court would deduct prior amounts paid by

29

State Farm after the verdict was reached.  When read together, these instructions advised the jury that it was not to consider the issue of duplication of damages, which would be addressed by the court postverdict. The trial court ultimately disagreed with the defendants' position that the damages awarded by the jury represented "fire-related repair/replacement costs" from which State Farm's prior payment must be deducted.  The trial court's decision was not so irrational or arbitrary that no reasonable person could agree with it.  (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)  We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.


Jackson, P. J.


WE CONCUR:

Simons, J.
Chou, J.


A168938/*Daniels v. State Farm General Ins. Co.*

30